UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

DANIEL HAMPTON, JR.,

                    Plaintiff,
       -vs-                           **No. 6:14-CV-06663 (MAT)**
                                      **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

─────────────────────────────

## I.   Introduction

Represented by counsel, Daniel Hampton, Jr. ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, the Commissioner's motion is granted.

## II.  Procedural History

The record reveals that in September 2011, plaintiff (d/o/b September 22, 1985) applied for DIB and SSI, alleging disability as of February 11, 2011. After his applications were denied, plaintiff requested a hearing, which was held before administrative law judge John P. Costello ("the ALJ") on March 5, 2013. The ALJ issued an

unfavorable decision on April 22, 2013. The Appeals Council denied review of that decision and this timely action followed.

## III. Summary of the Relevant Evidence

### A. Testimony

At his hearing in March 2013, plaintiff testified that he last worked the month before, as a forklift operator for a wine company. In that position, at which he worked for four months, plaintiff was required to lift as many as 100 cases of wine (approximately 25 pounds each) in a single shift. T. 43-44. Plaintiff testified that he injured his back on the job and that a physician from Urgent Care released him to go back to work; however, at that point, he was no longer needed for the position. At the time of his hearing, he had applied for unemployment.

At a previous full-time job as a forklift operator, which plaintiff held for about five months in 2011, he was required to lift 100 to 150 pounds at a time. He testified that he suffered a neck injury on the job, and that a doctor at the Clifton Health emergency department "told [him] to ice [it] and basically don't use it for a few days." T. 47. He left that job to work for the wine company, which offered him better pay for similar work.

Prior to his 2011 job, plaintiff worked for about three months for his cousin, assisting with home inspections. T. 49. This job fluctuated between part-time and full-time, depending on demand. He also had prior work experience as a heavy machine operator and pipe

2

layer, both of which jobs he left voluntarily; and as a stocker, which job required him to regularly lift and carry 15 to 20 pounds.

Plaintiff testified that he suffered from pain in his mid and lower back, which often radiated to his upper and lower extremities. At the time of his hearing, he was not taking any medication for pain; however, he testified that he "just received [his] insurance not too long ago," and had an upcoming doctor's appointment. T. 58. He testified that his pain level at the hearing was 8/10 in his back, and he was "on a thin line of bearing with it." T. 61. In his neck, he testified that he had 4/10 pain. According to plaintiff, he had been diagnosed with bipolar disorder but was not currently treating, with medication or counseling, for that condition. He testified that while at work, he felt paranoid and preferred to deal with people only once in a while.

In terms of his own functional capabilities, plaintiff testified that he could "barely" lift a gallon of milk; he experienced sharp pain "up towards [his] neck" when he sat for too long a time, and he could sit for no longer than a half hour as a result; standing did not pose a problem and "[a]ctually sometimes it help[ed]"; and he could walk for no more than three or four blocks at a time. T. 66.

## B. Medical Record

Medical records from the relevant time frame indicate that plaintiff treated intermittently at Thompson Memorial Hospital

("Thompson"), Canandaigua, New York, complaining on most occasions of neck and back pain. There is no indication from any of these records that plaintiff's pain or injuries ever kept him out of work for more than a week's time.

An October 2009 lumbar spine MRI showed mild disc dessication at L2-3 and mild disc bulging at L4-5, with no evidence of a disc herniation. In June 2010, plaintiff complained of lumbar pain and it was noted that he had a history of degenerative disc disease at L2-3 and L4-5. At that time, Dr. Gordon Whitbeck recommended facet joint injections for pain and noted that plaintiff was "currently working in his regular capacity and no statement regarding his degree of disability [was] pertinent." T. 287. In July 2010, plaintiff suffered a clavicle fracture after being "thrown to the ground [by] a heavy man." T. 403. He was advised to apply ice intermittently and was prescribed pain medication with no refills. In October 2010, plaintiff complained of back pain associated with lifting heavy drywall. He was diagnosed with lower back pain and instructed not to work for two days.

In January 2011, plaintiff treated at Thompson and complained of an injury to his left hip and ankle. He was advised to ice the area intermittently and "walk and bear weight as tolerated." T. 377. On February 5, 2011, plaintiff complained of an injury to the left leg. Physical examination revealed tenderness in the left calf; plaintiff was advised to apply ice intermittently and elevate

when possible. He was also advised not to work for three days. An April 28, 2011 MRI of the left knee was unremarkable. On August 9, 2011, plaintiff reported the "possibility of an injury," which he believed resulted from his "lifting, turning, and bending." T. 364. He was advised to use warm compresses or soaks three times a day, and was told not to work for two days. On August 17, 2011, after plaintiff treated at Thompson complaining of neck pain, he was advised to ice the strained area and it was noted that he would be "[o]ff work for 2 days." T. 361.

In September 2012, plaintiff complained of an injury to his head and neck, which had occurred while standing under a machine at work. X-rays of plaintiff's head and neck were normal. He was advised to apply ice intermittently and was cleared to return to work that day, which he did. In January 2013, plaintiff complained of back pain radiating to his left lower extremity. On physical examination, plaintiff had a "[n]ormal inspection" of his lower back, although moderate muscle spasm and tenderness were noted. He was diagnosed with acute lumbar strain, chronic lumbar radiculopathy, and chronic probable herniated disc. He was advised to return to work in eight days.

Evidence regarding plaintiff's mental impairments indicates that plaintiff consistently reported having been diagnosed with bipolar disorder at the age of ten. The record indicates that in October, 2010, plaintiff presented to the Thompson ER expressing

thoughts of suicide. He testified that he had been diagnosed with bipolar disorder but had not treated for the condition in over ten years. Plaintiff's blood alcohol content was 0.51. Plaintiff was discharged with no prescriptions and advised to seek outpatient counseling. For the majority of the relevant time frame, however, plaintiff received no treatment for this condition. A May 18, 2011 treatment note from Clifton Springs Behavioral Health Services indicated that plaintiff had been seen for treatment, and developed a treatment plan, but his case was closed due to his treatment being incomplete. It was noted that plaintiff "did not follow through with attendance requirements." T. 312.

### C. Consulting Examinations

In December 2011, Dr. Karl Eurenius performed a consulting orthopedic examination at the request of the state agency. On physical exam, plaintiff demonstrated a normal gait; normal heel-toe walk except that plaintiff reported pain in his back; plaintiff reported pain with squat, which was one fourth of normal; station was normal; plaintiff needed no help changing for the examination or getting on or off the exam table, and he could rise from a chair without difficulty. Plaintiff's cervical spine was normal. He had a full range of motion ("ROM") of the shoulders but stated that elevating his right shoulder caused pain, and otherwise his upper extremities were normal. Regarding his lumbar spine, plaintiff was able to flex to approximately 80 degrees with pain

and tenderness in the low to mid back; he had full lateral flexion and full rotation, but reported pain; he demonstrated "mild tenderness" to palpation of the low lumbar region; he had no scoliosis or kyphosis; and straight leg raise ("SLR") was to 60 degrees bilaterally, with plaintiff again reporting pain. T. 484. His lower extremities were normal.

Dr. Eurenius opined that plaintiff had "limitations in sitting and standing for more than 20 minutes, walking more than two blocks, climbing or descending more than a flight[] of stairs, bending, lifting, or carrying more than ten pounds due to chronic low back pain," and he would have "some limitations lifting, carrying, reaching, and handling objects with his right arm due to right shoulder pain." Id. Dr. Eurenius ordered X-Rays of plaintiff's left shoulder and lumbar spine, the results of which were normal.

In December 2011, Dr. Trica Peterson completed a psychiatric evaluation at the request of the state agency. Plaintiff reported that he had been diagnosed with bipolar disorder and had been hospitalized overnight sometime in 2010 "due to threatening to hurt himself." T. 476. He reported that he had been "put on medication" but he did not follow through with taking the medication and he was not currently in psychiatric treatment. T. 476-77. Plaintiff reported symptoms primarily of irritability and anger. He also reported a history of both alcohol and drug abuse, including

marijuana and cocaine. He had two prior arrests, one for disorderly conduct and one for petit larceny. On mental status examination ("MSE"), plaintiff's affect was "[i]rritated, although . . . cooperative"; attention and concentration were intact although plaintiff reported work-related difficulty remembering complex tasks; recent and remote memory were mildly impaired; and cognitive functioning appeared below average. Insight appeared poor and judgment was fair.

Dr. Peterson opined that plaintiff was "able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular work schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions, [and] relate adequately with others, although he [could not] appropriately deal with stress." T. 480. According to Dr. Peterson, plaintiff's "difficulties appear[ed] to be caused by his psychiatric symptoms and personality issues." Id. In January 2012, reviewing agency psychologist Dr. T. Inman-Dundon concluded that plaintiff had no restrictions of activities of daily living ("ADLs"); mild difficulties in maintaining concentration, persistence, or pace; moderate difficulties in social functioning; and no prior episodes of decompensation.

## IV.   The ALJ's Decision

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since February 11, 2011, the alleged onset date. At step two, the ALJ found that plaintiff suffered from degenerative disc disease of the lumbar spine and bipolar disorder, both of which were severe. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Regarding his mental health impairments, the ALJ determined that plaintiff had mild restrictions in ADLS, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace.

Before proceeding to step four, the ALJ determined that, considering all of plaintiff's impairments, plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that plaintiff could only frequently reach; plaintiff should work primarily alone (with respect to working in coordination with others) with only occasional supervision; and plaintiff was limited to performing simple tasks.

After finding that plaintiff could not perform any past relevant work, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which plaintiff could perform. Accordingly, he found that plaintiff was not disabled.

## IV. Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A. RFC

Plaintiff contends that the ALJ's physical RFC finding was unsupported by substantial evidence. Specifically, plaintiff argues that because the ALJ gave Dr. Eurenius's consulting opinion little weight, his RFC finding was therefore based on a bare interpretation of the medical findings. After reviewing the record and the ALJ's decision, the Court concludes that the ALJ's RFC finding was based on substantial evidence.

Dr. Eurenius's opinion was the only formal functional assessment present in the record. As noted above, Dr. Eurenius

opined that plaintiff had "limitations in sitting and standing for more than 20 minutes, walking more than two blocks, climbing or descending more than a flight[] of stairs, bending, lifting, or carrying more than ten pounds due to chronic low back pain," and he would have "some limitations lifting, carrying, reaching, and handling objects with his right arm due to right shoulder pain." Id. This was based on Dr. Eurenius's one-time physical examination, in which plaintiff complained of pain and demonstrated certain limitations in range of motion. X-rays ordered by Dr. Eurenius in connection with the examination, the results of which did not come back until about a week after his exam, were normal.

Although Dr. Eurenius was the only medical source to provide a formal assessment regarding plaintiff's functional limitations, the record contains many treatment notes from Thompson, where plaintiff regularly treated. These notes indicate that functional limitations associated with his episodic complaints resulted in, at most, an inability to perform his work-related activities for a period of seven days. Most often, plaintiff was instructed not to work for periods of one to three days. Notably, according to the medical records and plaintiff's own testimony, plaintiff's work involved operating heavy machinery, lifting, and carrying.

By his own testimony, during the relevant time frame and up until about a month before his hearing, plaintiff performed work requiring him to lift from ten to fifteen pounds. Previously,

11

plaintiff had performed work requiring him to lift up to 100 to 150 pounds. However, at the time of his hearing, plaintiff testified that he was "barely" able to lift a gallon of milk. The medical record in this case does not establish any support for such a dramatic shift in plaintiff's capabilities from the time he was let go from his job one month prior to the hearing, to the time of the hearing. Also significantly, plaintiff testified that his separation from all of his previous jobs was either voluntary or due to disciplinary issues; i.e., he did not cease working due to a medical condition. Plaintiff also testified that, contrary to Dr. Eurenius's opinion that he could only walk two blocks, he could actually walk three to four blocks.

The ALJ's RFC finding limited plaintiff to light work, which requires lifting no more than 20 pounds. See 20 C.F.R. §§ 404.1567(b), 416.967(b). He also limited plaintiff's reaching, in consideration of his allegations of a shoulder impairment, to only occasionally. This physical RFC finding was consistent with substantial evidence in the record. Plaintiff's own testimony regarding his work activities, as well as his treatment notes from Thompson, constitute substantial evidence supporting a finding that he was able to perform at least the requirements of light work. See, e.g., Napierala v. Astrue, 2009 WL 4892319, *8 (W.D.N.Y. Dec. 11, 2009) (holding that plaintiff's own reports of daily and work activities constitute substantial evidence supporting the

ALJ's RFC finding); Jaskiewicz v. Comm'r of Soc. Sec., 2010 WL 5138477, *6 (N.D.N.Y. Dec. 10, 2010) ("The medical evidence and plaintiff's own testimony . . . support the ALJ's RFC determination. Accordingly, [plaintiff]'s contention that the ALJ created his own medical opinion inconsistent with the record is rejected.").

**B. Credibility**

Plaintiff contends that the ALJ erroneously assessed his credibility. In his decision, the ALJ considered plaintiff's testimony and actually credited many of plaintiff's reports regarding his abilities to perform work activities. However, the ALJ determined that plaintiff's more restrictive reports of his functional limitations – such as being almost unable to lift a gallon of milk at the time of his hearing despite having performed work a month prior which required lifting 25-pound cases of wine – were inconsistent with the medical evidence in the record. This evidence, as noted above, included many treatment notes indicating that plaintiff was generally able to perform the physical demands of his prior jobs, and was restricted from work only in episodic circumstances in which he was advised he could return to work within short order. Plaintiff testimony was thus only partially consistent with the substantial evidence of record, and the ALJ accordingly credited those portions of testimony which were consistent.

Plaintiff also argues that the ALJ inappropriately interpreted plaintiff's lack of treatment as a sign of less severe symptoms, when plaintiff testified that he had had trouble obtaining insurance and had just procured Medicaid coverage prior to the hearing. However, a review of the ALJ's decision does not indicate that the ALJ overemphasized plaintiff's lack of treatment in considering plaintiff's impairments. Moreover, as the Commissioner points out, with regard to plaintiff's mental health treatment, there is no indication in the record, and plaintiff has not suggested, that the reason plaintiff failed to appear for several mental health appointments was actually because he lacked insurance. Under these circumstances, where the ALJ's reasoning for arriving at his credibility determination is clear and there is substantial evidence in the record to support it, any error in failing to consider plaintiff's insurance status was harmless. See, e.g., Kittelson v. Astrue, 362 F. App'x 553, 558 (7th Cir. 2010) (holding that although the ALJ erred "by not considering the impact of Kittelson's lack of health insurance, . . . this error was harmless because [the ALJ] also based his assessment on the absence of evidence of serious functional limitations due to depression or episodes of decompensation").

Here, the ALJ's conclusion that plaintiff's self-reports and complaints were partially incredible because they were inconsistent with substantial record evidence, and inconsistent with each other,

was based on a proper application of the law and is supported by the record. The ALJ appropriately followed the two-step credibility analysis, citing the relevant authorities in that regard. T. 22 (citing 20 C.F.R. §§ 404.1529, 416.929; SSRs 96-4p, 96-7p); see Britt v. Astrue, 486 F. App'x 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96-7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility). His credibility determination will therefore not be disturbed.

## VI.  Conclusion

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Doc. 10) is denied and the Commissioner's motion (Doc. 12) is granted. The ALJ's finding that plaintiff was not disabled is supported by substantial evidence in the record, and accordingly, the Complaint is dismissed in its entirety with prejudice.  The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     February 3, 2016
           Rochester, New York.